**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL CASE NO. 1:09cv42**

| | |
|---|---|
| **ARTHUR SNOZNIK and** ) | |
| **BETSY SNOZNIK,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **MEMORANDUM OF** |
| **vs.** ) | **DECISION AND ORDER** |
| ) | |
| **JELD-WEN, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the following motions:

(1)    Defendant's Motion to Exclude Expert Testimony of Bryan

Durig [Doc. 45];

(2)    Defendant's Motion to Exclude Expert Testimony of

Ruston Hunt [Doc. 46];

(3)    Plaintiffs' Motion to Exclude Expert Testimony [Doc. 50];

(4)    Defendant's Motion to Strike Affidavits of Dr. Durig and

Dr. Hunt [Doc. 66];

(5)    Defendant's Motion to Strike Arthur Snoznik's Affidavit

[Doc. 67]; and

(6)    Defendant's Motion for Summary Judgment [Doc. 51].

The parties' motions to exclude [Docs. 45, 46, 50] challenge the reliability and admissibility of certain expert opinions pursuant to Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The Defendant's motions to strike [Docs. 66, 67] challenge the admissibility of certain affidavits that were filed by the Plaintiffs in opposition to the Defendant's <u>Daubert</u> motions.

Having conducted a <u>Daubert</u> hearing with respect to the challenged experts and having carefully reviewed the entire record in this case, the Court concludes that the opinions proffered by the Plaintiffs' experts are unreliable and should therefore be excluded. The Court further concludes that the Plaintiffs have failed to present a forecast of evidence to establish that the window was defective or that a defect in the window was the proximate cause of their injuries, and therefore, the Defendant is entitled to a judgment as a matter of law with respect to all of the Plaintiffs' claims.

## I.   PROCEDURAL BACKGROUND

In this products liability action, the Plaintiff Arthur Snoznik asserts claims of negligence, breach of implied warranty of merchantability, and breach of express warranty against the Defendant Jeld-Wen, Inc., for injuries sustained when Mr. Snoznik fell from a second-story casement window manufactured by the Defendant.  [Doc. 1-2].  Mr. Snoznik's wife, Betsy Snoznik, also asserts a claim for loss of consortium.  [Id.].  The Plaintiffs initially filed their Complaint in state court, but the Defendant subsequently removed this action to this Court on the grounds of diversity jurisdiction.  [Doc. 1].

Pursuant the Pretrial Order and Case Management Plan entered on April 7, 2009, the Plaintiffs had until June 1, 2009, to disclose their experts. The Defendant's deadline for the disclosure of experts was set for July 1, 2009.  Additionally, the parties were given deadlines of October 1, 2009, for the completion of discovery; September 15, 2009, for the filing of Daubert motions; and November 1, 2009, for the filing of dispositive motions.  [Doc. 19].

The Plaintiffs disclosed several experts on June 1, 2009, including Dr. Bryan Durig, a design defect expert, and Dr. Taylor Kress, a human

factors/warnings expert.  On June 6, 2009, the Court entered an Order

granting the Plaintiffs leave to designate a replacement human

factors/warnings expert due to the fact that Dr. Kress had become

uncooperative and unresponsive.  [Doc. 26].  The Plaintiffs disclosed a new

replacement human factors/warnings expert, Dr. Ruston Hunt, on July 1,

2009.

On June 30, 2009, the Court entered an Order extending the

Defendant's deadline for the disclosure of expert witnesses with respect to

liability issues until August 1, 2009.  [Doc. 35].  In accordance with this

deadline, the Defendant disclosed Howard Rigsby and Dr. Charles

Manning as experts on design defects, and Dr. Michael Romansky as a

human factors/warnings expert.

On September 16, 2009, the Court entered an Order extending the

deadline for the filing of Daubert motions until October 20, 2009.  [Doc. 42].

The parties filed their respective Daubert motions in accordance with this

deadline.  [Docs. 45, 46, 50].  The Defendant then filed its Motion for

Summary Judgment on November 2, 2009.  [Doc. 51].  On November 3,

2009, the Plaintiffs filed their responses to the Defendant's Daubert

motions. [Docs. 54, 55].  In support of these responses, the Plaintiffs

submitted affidavits of Dr. Durig, Dr. Hunt, and the Plaintiff Arthur Snoznik, which affidavits purport to supplement their previous testimony. [Docs. 56-13, 56-14, 54-16]. The Defendant moved to strike each of these affidavits on November 16, 2009. [Docs. 66, 67].

The Court held a <u>Daubert</u> hearing on March 15, 2010, at which the parties had the opportunity to present evidence as well as the testimony of the challenged expert witnesses. The parties having been fully heard on these issues, these motions are now ripe for disposition.


## II.    FACTUAL BACKGROUND

Viewed in the light most favorable to the Plaintiffs, the relevant facts are as follows. On April 15, 2006, the Plaintiff Arthur Snoznik fell from an open second-story casement window while helping his wife, Betsy, clean the exterior sashes of their home. Mr. Snoznik suffered a spinal cord injury as a result of this fall.

The window from which Mr. Snoznik fell is a Norco Series D casement window manufactured by the Defendant. The window has top and bottom hinges, which allow the sash to be cranked open 90 degrees. These hinges, known as Easy Wash hinges, have a special feature by

which one can slide the sash toward the center of the window frame, allowing for the washing of the exterior glass of the sash from the inside of the building.  This is accomplished by disconnecting the control arm of the hinge and "breaking"[1] the lower and upper arms of the hinge at a point so as to allow those arms to be manipulated into an L-shape, thus allowing for the movement of the sash.  The sash itself is 28" x 72" and weighs approximately 50 pounds.

The Norco Series D casement window also has a function that allows the sash to be removed from the frame for painting, repairs to the glass or sash replacement.  The hinges at the top and bottom of the sash are attached to a hinge post, and the hinges must be pried off the post in order to detach the sash.  The words "PRY UNDER HERE" are imprinted on the hinge arm between the hinge post and the Easy Wash rotation point to provide guidance in performing this particular function.

In March 2001, the Snozniks accompanied their architect to Jennings Building Supply to select windows for their new home.  During that visit,

---

[1]The upper arm and the lower arm each consist of two pieces which are themselves hinged, but are fashioned to operate as rigid members by a metal tab, which keeps the hinge in the arm from functioning until the arm is "broken" by the release of the tab, which in turn allows the sash to be slid toward the center of the window frame.

Mrs. Snoznik received oral instructions and a physical demonstration of the cleaning of a casement window. [First Deposition of Betsy Snoznik ("B. Snoznik Dep. I"), Doc. 49-3 at 21]. Mr. Snoznik does not recall seeing such a demonstration during this visit. [Deposition of Arthur Snoznik ("A. Snoznik Dep. I"), Doc. 49-1 at 49, 53]. Three years later, after the Defendant's casement windows were installed in the Snozniks' home, Mrs. Snoznik returned to Jennings Building Supply and received a demonstration of the operation of the Easy Wash hinge. [B. Snoznik Dep. I, Doc. 49-3 at 26-27]. At this time, Mrs. Snoznik was told that to clean the exterior sashes, she was to disconnect the control arm, rotate the upper and lower hinges into an "L" shape with her hand, and slide the sash toward the center of the window frame for access to the exterior pane. [Id. at 21-24, 27-28, 46]. Mr. Snoznik does not recall going to Jennings Building Supply in 2004 to ask questions about cleaning casement windows [A. Snoznik Dep. I, Doc. 49-1 at 45], and Mrs. Snoznik states that Mr. Snoznik did not attend this demonstration [B. Snoznik Dep. I, Doc. 49-3 at 24]. At no time did the Snozniks receive written instructions from the Defendant regarding the operation of the Easy Wash hinge. [Id. at 10-11, 15, 28 and Doc. 49-4 at 99; A. Snoznik Dep. I, doc. 49-1 at 45, 49].

The Snozniks had installed a series of nine casement windows in their living room. [B. Snoznik Dep. I, Doc. 49-3 at 28-29]. It was the second of these windows, which shall be referred to as "Window No. 2," where the accident occurred. [Id. at 29-30]. Prior to the accident, the Snozniks had opened their casement windows at various times. [Id. at 28]. Mrs. Snoznik had not any prior difficulties with Window No. 2. [Id. at 32].

In her first deposition taken on September 6, 2007, Mrs. Snoznik described the cleaning process on the day of the accident as follows. Mrs. Snoznik cleaned the interior of the sashes in the morning. When Mr. Snoznik returned from town, he joined her so that he could assist in cleaning the exterior sashes. Mrs. Snoznik showed Mr. Snoznik what she had been instructed to do at Jennings Building Supply. [Id. at 43]. Mrs. Snoznik cranked open Window No. 2 and disconnected the control arm as she had been instructed to do. [Id. at 45, 47]. Mrs. Snoznik then rotated the lower hinge into the "L" position with her hands, and she observed Mr. Snoznik rotate the top hinge. [B. Snoznik Dep. I, Doc. 49-3 at 43-44 and Doc. 49-4 at 59, 60]. Mrs. Snoznik testified that the hinge was still connected to the sash when Mr. Snoznik made the hinge adjustment. [Id., Doc. 49-4 at 126-27, 129].

After moving the hinges into the "L" position, Mr. Snoznik then slid the sash a couple of inches toward the center of the frame. [Id., Doc. 49-3 at 48-49]. Mrs. Snoznik recalled that the top part of the sash seemed to move more than the bottom part. [Id. at 49]. She testified that Mr. Snoznik moved the top part of the sash back toward the frame a little bit and then moved both the top and bottom part of the sash evenly toward the center of the frame. [Id. at 50]. Mrs. Snoznik did not think that the sash was wobbling during this process, although she did note some movement or "give" in the sash. [Id. at 50 and Doc. 49-4 at 58].

With the sash now in place for cleaning, Mr. Snoznik stood on the floor and held on to the sides of the sash while Mrs. Snoznik, using a stepladder, began cleaning the exterior pane through the Easy Wash opening. [Id., Doc. 49-3 at 50-52]. Mrs. Snoznik cleaned the top and bottom outside corners and was working on removing some bird residue on the top half of the window when the sash fell out. [Id. at 52, 55]. Mr. Snoznik, being unable to brace himself or react quickly enough to release his hold on the sash, was pulled out of the window opening and fell to the ground. Mrs. Snoznik recalled that the top of the sash came loose first

and that while the window was falling, the bottom hinge made a popping noise.  [Id., Doc. 49-4 at 56].

Due to the nature of his injuries, Mr. Snoznik has little memory of the events leading up to the accident.  In his first deposition taken on September 6, 2007, Mr. Snoznik testified that he did not use a stepladder while cleaning the windows.  [A. Snoznik Dep. I, Doc. 49-1 at 68].  Mr. Snoznik denied making any adjustments to the hinges, stating rather that Mrs. Snoznik made these adjustments while he watched.  [Id. at 84-85].

Mr. Snoznik testified that his sole role in the cleaning of the windows was to hold the sash while Mrs. Snoznik cleaned the exterior.  He recalled that the sash "wobbled a little bit," so he needed to hold the sash to steady it while Mrs. Snoznik cleaned.  [Id. at 76].  Mr. Snoznik did not have any feeling, however, that the sash was unstable.  [Id. at 90].  Mr. Snoznik testified that he held on to the window for a couple of minutes before the sash fell out.  [Id. at 78].

In her second deposition, which was taken on September 18, 2009, Mrs. Snoznik gave a somewhat different version of the events leading up to the accident.  Specifically, she testified that after she rotated the bottom hinge, Mr. Snoznik stood on the bottom rung of the stepladder and rotated

the top hinge into the "L" position. Mrs. Snoznik testified that she then left the living room, went to the bathroom, and then took a cigarette break for approximately five minutes. [Second Deposition of Betsy Snoznik ("B. Snoznik Dep. II"), Doc. 49-5 at 121]. At the time that she left the room, Mrs. Snoznik saw that neither the top hinge nor the bottom hinge was disconnected. [Id. at 119]. When she returned to the living room, Mr. Snoznik was standing back on the floor and was holding the sash with both hands, and the sash did not appear to be stable. [Id. at 123, 124, 128]. Mr. Snoznik then slid the sash over toward the center, and Mrs. Snoznik began cleaning the window. [Id. at 131]. Because she was out of the room for four to five minutes, Mrs. Snoznik does not know whether Mr. Snoznik disconnected the top hinge arm from the hinge post in her absence. [Id. at 118]. For his part, Mr. Snoznik cannot recall whether he disconnected the top hinge arm. [Second Deposition of Arthur Snoznik ("A. Snoznik Dep. II"), Doc. 49-2 at 36].

## III.   DAUBERT MOTIONS

### A.   Standard of Review

Although state law controls the substantive tort issues in this diversity action, the admissibility of expert testimony in this case is governed by federal law.  See Bryte ex rel. Bryte v. Am. Household, Inc., 429 F.3d 469, 476 (4th Cir. 2005).  Rule 702 of the Federal Rules of Evidence provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The trial judge must act as a gatekeeper, admitting only that expert testimony which is relevant and reliable.  Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).  With regard to scientific knowledge, the trial court initially must determine whether the reasoning or methodology used is scientifically valid and is applied properly to the facts at issue in the trial.  Id.  To aid the Court in this gatekeeping role, the Supreme Court has identified several key

considerations, including whether the expert opinion can be tested; whether it has been subjected to peer review; the error rate of the methods that the expert employed; the existence and maintenance of standards used in the expert's methods; and whether the expert's methods are generally accepted in the scientific community. Id. at 592-94, 113 S.Ct. 2786; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 261 (4th Cir. 2005).

The objective of Daubert's gatekeeping requirement is to ensure "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court has broad discretion in determining whether the Daubert factors reasonably measure reliability in a given case. Id. at 153, 119 S.Ct. 1167.

## B.    Dr. Bryan Durig

The Defendant seeks to exclude the testimony of the Plaintiffs' design expert, Dr. Bryan Durig. For grounds, the Defendant argues that

Dr. Durig is not qualified to testify regarding the design of windows or window hinges, and that his opinions are not reliable.

### 1. Dr. Durig's Qualifications

Dr. Durig is a consulting engineer with Summit Engineering, L.L.P. in Columbia, South Carolina. He obtained a B.S., M.S., and Ph.D. in mechanical engineering as well as a Master's degree in Business Administration from the University of South Carolina. He is also a licensed engineer in the state of North Carolina. In his position as a consulting engineer with Summit Engineering, Dr. Durig specializes in the area of engineering analysis of accidents. He has conducted numerous engineering analyses and accident investigations related to the safety of various pieces of machinery and equipment, and he has been qualified as an expert in state and federal courts on numerous occasions. [Durig CV, Doc. 56-13 at 8].

### 2. Dr. Durig's Opinions

#### a. Dr. Durig's Report

In his report dated June 1, 2009, Dr. Durig states two primary opinions. First, he opines that the Norco Series D casement window is defective and unreasonably dangerous due to its lack of a positive

attachment method and lack of a safety screw or spring loaded ball. Second, he opines that there are economically feasible alternative designs that would have prevented Mr. Snoznik's accident and subsequent injuries. [Durig Report, Doc. 49 at 3-5].

With respect to his opinion that a more positive attachment method is needed, Dr. Durig notes in his report that on two occasions in examining an exemplar Norco window, while holding and adjusting the window sash with the top leaning towards the middle (as the Snozniks testified they were doing during the cleaning process), the hinge bar came off the plastic rivet that served as the hinge post and the sash proceeded to fall out of the hinge track. Dr. Durig further notes that on other occasions, bending the top hinge into the "L" shape caused the hinge bar to be pulled downward, thus partially sliding off of the hinge post. Dr. Durig opines that in light of these conditions, a more positive attachment method, such as requiring the use of some form of tool to remove the hinge bar from the post, should have been used and would have prevented this accident. [Id.].

Dr. Durig further opines that a second alternative design would have been to use a safety screw in the safety screw hole of the hinge track. He opines that the use of such a screw would have prevented the plastic slide

from coming out of the hinge track and thus would have prevented this accident.  He notes that a safety screw could have been used in such a way so as not to interfere with the operation of the hinge.  [Id.].

A third alternative design proposed by Dr. Durig is the use of a spring loaded ball that would pop up when the casement window is open and would prevent the plastic slide from coming out of the hinge track.  Dr. Durig opines that the use of such a spring loaded ball would have prevented the accident that injured Mr. Snoznik.  [Id.].

### b.    Dr. Durig's Deposition Testimony

Dr. Durig was deposed on two occasions: once on October 8, 2008, and again on July 9, 2009.  In his first deposition, Dr. Durig testified that based on the physical evidence, it is his opinion that the sash will not come out of the window frame unless the hinge arm connecting the window sash to the window frame is disconnected from the hinge post.  He theorized that the hinge arm could have been disconnected from the post some time before the accident, possibly by a painter.  He acknowledged, however, that there was no evidence to support his theory that a painter had disconnected the hinge, and that this was pure speculation on his part. [First Deposition of Bryan Durig ("Durig Dep. I"), Doc. 49-6 at 49, 52-54 and

16

Doc. 49-7 at 156].[2]  Alternatively, Dr. Durig theorized that Mr. Snoznik could have disconnected the top hinge himself, mistakenly believing that the words "PRY UNDER HERE" required the hinge to be pried off in order for the sash to be moved into the Easy Wash position.  [Id., Doc. 49-6 at 49].

Dr. Durig described his testing methodology as consisting of opening and closing the window and manipulating the hinges numerous times. [Durig Dep. I at 82, 83].  In doing so, he noted that he could not get the hinge to detach spontaneously.  [Id. at 98].  He also attempted to use force to disconnect the hinge.  [Id. at 83].  He testified that at first he did not measure the force he applied in attempting to disconnect the hinge.  [Id. at 89, 90].  Once he had managed to disconnect the hinge two or three times, he used a digital force gauge two or three times to measure the amount of force required to disconnect the hinge arm from the post.  [Id. at 83, 90]. Although he did not write down any of these measurements, he recalled that the measurements were in the range of 16.8 to 17.6 pounds.  [Id. at

---

[2]This theory appears to have been abandoned by the Plaintiffs altogether, as the Plaintiffs concede in their response brief that the window cannot properly close unless the hinge is properly seated on the hinge post.  [See Doc. 54 at 3].

90].  He further noted that the hinge became easier to disconnect after being removed several times.  [Id. at 92].

In his second deposition taken ten months later, Dr. Durig testified that he had engaged in a second round of testing in May and July 2009 and that during this additional testing, he observed that the hinge arm sometimes spontaneously detached from the hinge post when the hinges were rotated into the Easy Wash position.  [Second Deposition of Bryan Durig ("Durig Dep. II"), Doc. 49-8 at 18-19].  This second round of testing also involved repeated opening and closing of the window and manipulation of the Easy Wash hinge.  Dr. Durig could not recall whether he used his fingers or a tool to perform this second round of hinge manipulations, nor could he recall exactly how many times he removed the hinge from the exemplar window.  [Durig. Dep. II at 21].  Dr. Durig also could not recall when or how often he popped off the top versus the bottom hinge, or how many times he popped off the hinge while it was in the straight position versus the "L" position.  [Id. at 21, 24].

Dr. Durig did not make any written notes or videos of this second round of testing.  [Id. at 92].  Although he did take photographs of the hinge being detached from the post, all of these photographs were taken on July

8, 2009, the day prior to his second deposition; no photographs were taken of the May 2009 testing.  [Id. at 18, 53].  Additionally, while Dr. Durig took a photograph which showed the sash not being level and "pulling" the hinge off the post, he could not recall how many times the hinge had been previously popped off the post or moved into the "L" position when this photograph was taken.  [Id. at 87-89].  He further acknowledged that the hinge post had become scuffed and worn from his manipulations, but he never measured or accounted for the effect that this wear and tear had on the hinge components.  [Id. at 89].

With respect to his opinions regarding alternative hinge attachment designs, Dr. Durig admitted that he had not done any drawings of such designs, nor had he performed any testing to support his opinions.  [Durig Dep. I, Doc. 49-7 at 147].

### c.    Dr. Durig's Supplemental Affidavit

On November 3, 2009, in response to the Defendant's motion to exclude Dr. Durig as an expert witness, the Plaintiffs submitted an affidavit by Dr. Durig, in which he addresses some of the criticisms leveled against him in the Defendant's Daubert motion.  In response to the Defendant's argument that he failed to test any of his proposed alternative designs, Dr.

Durig states in his affidavit that since his last deposition in July 2009, he has tested the alternative safety screw design, and that the results of this testing confirm the opinions that he expressed in his original report. [Affidavit of Bryan Durig ("Durig Aff."), Doc. 56-13 at ¶¶3-4]. In response to the Defendant's argument that the spontaneous detachment he observed resulted from the wear caused by his repeated manipulation and use of force on the hinge arm in prior testing, Dr. Durig states in his affidavit that to the extent that his testing caused any wear, the Defendant should have anticipated such repeated manipulations in designing the hinge bar connection. [Id. at ¶5].

### 3. Analysis

#### a. Motion to Strike Durig Affidavit

Before addressing the reliability of Dr. Durig's opinions, the Court must determine whether Dr. Durig's supplemental affidavit may be considered as part of his opinions in this case. The Defendant contends that this supplemental affidavit is untimely and is merely an attempt to bolster Dr. Durig's unreliable opinions. [Doc. 66]. The Plaintiffs counter that the affidavit is a proper supplementation of Dr. Durig's opinions and was therefore timely and properly filed. [Doc. 71].

Federal Rule of Civil Procedure 26(a) requires the parties to "supplement [their expert] disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(D). Rule 26(e), in turn, provides as follows:

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure . . . is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Fed. R. Civ. P. 26(e)(1)(A). Specifically with respect to expert reports, Rule 26(e) provides as follows:

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2).

While supplementation allows a party to correct inadvertent mistakes or omissions in an expert report, it "is not a license to amend an expert report to avoid summary judgment." Gallagher v. S. Source Packaging, LLC, 568 F.Supp.2d 624, 631 (E.D.N.C. 2008). "To rule otherwise would create a system where preliminary reports could be followed by

supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify reports previously given." Beller ex rel. Beller v. United States, 221 F.R.D. 696, 701 (D.N.M. 2003). As the Middle District of North Carolina has noted, "[t]o construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation." Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306, 310 (M.D.N.C. 2002).

In the present case, Dr. Durig's affidavit offers new opinions and testing to support his previously disclosed opinions. It is evident from the nature of Dr. Durig's supplemental testimony that the Plaintiffs submitted this affidavit not in an effort to correct an inadvertent mistake or omission in Dr. Durig's report but in an attempt to bolster Dr. Durig's opinions so that he may withstand the Defendant's Daubert challenge. Dr. Durig's affidavit is not a timely supplementation as permitted under Rule 26(e); it is a new, but untimely, expert disclosure.

Having determined that Dr. Durig's affidavit is untimely, the Court must now determine what kind of sanctions to impose, if any, for this late

disclosure. Because a Pretrial Order and Case Management Plan has been entered in this case setting forth the deadlines for expert disclosures, the Court looks to Federal Rule of Civil Procedure 16(f) to determine the appropriate sanctions to be imposed for this violation. See Akeva, 212 F.R.D. at 309. Rule 16(f) provides that the Court "may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). The Court may impose a wide range of sanctions for violations of Rule 16(f), including exclusion of the expert's untimely testimony. See Akeva, 212 F.R.D. at 309; Fed. R. Civ. P. 37(b)(2)(A)(ii). The imposition of sanctions for Rule 16(f) violations is a matter within the Court's broad discretion. Akeva, 212 F.R.D. at 311.

In determining the appropriate sanction to be imposed, the Court may consider a number of factors, including: (1) the explanation given for the failure to comply with the scheduling order; (2) the importance of the expert opinion; (3) the prejudice to the opposing party if the untimely disclosure were allowed; (4) the availability of alternative or less drastic sanctions; (5) the parties' interest in resolving the litigation expeditiously; (6) the Court's

need to control and plan its docket; and (7) the public policy favoring the disposition of cases on their merits.  Id.

After careful consideration and weighing of the relevant factors, the Court concludes that the opinions and testing described in Dr. Durig's November 3, 2009 affidavit should be excluded.  As discussed earlier, the reason for Dr. Durig's untimely disclosure of these additional opinions and testing was not to correct a prior inadvertence or mistake but to shore up the weaknesses in Dr. Durig's opinions that were exposed by the Defendant's Daubert motion.  While the Plaintiffs contend that Dr. Durig's affidavit merely confirms the validity of his prior opinions, the Plaintiffs offer no explanation as to why such testing could not have been performed much earlier so that the test results could have been disclosed and fully discovered by the Defendant.

Additionally, the Defendant will be prejudiced if Dr. Durig's affidavit is not excluded.  The discovery deadline in this case has already passed.  The Defendant has already produced experts to rebut Dr. Durig's opinions, and these experts have been extensively deposed.  If Dr. Durig's additional opinions and testing were allowed, the Defendant would be required to seek supplemental reports from its rebuttal experts, and the parties would

be required to undergo additional rounds of depositions, which in turn undoubtedly would result in the filing of supplemental briefing, on both sides, related to the pending motion for summary judgment. This situation would not only result in additional expense to the parties, but would completely disrupt the trial schedule of this case. "The factors involving docket control planning are sufficiently important to alone justify the exclusion of an untimely disclosed expert report or opinion even in [the] absence of prejudice to the opposing party." <u>Akeva</u>, 212 F.R.D. at 311 (citing <u>Trilogy Communications, Inc. v. Times Fiber Communications, Inc.</u>, 109 F.3d 739, 745 (Fed. Cir. 1997).[3]

For these reasons, the Court concludes that Dr. Durig's untimely affidavit must be stricken. In considering the Defendant's <u>Daubert</u> motion and motion for summary judgment, the Court will consider only those

_____

[3]The two cases cited by the Plaintiffs, <u>Porter v. Hamilton Beach/Proctor-Silex, Inc.</u>, No. 01-2970-MAV, 2003 WL 21946595 (W.D. Tenn. Jul. 28, 2003), and <u>Scott v. Holz-Her, U.S., Inc.</u>, No. 6:04cv00068, 2007 WL 3171937 (W.D. Va. Oct. 26, 2007), are readily distinguishable from the instant case. In <u>Porter</u>, a supplemental expert report was allowed because it clarified the expert's prior opinion and also addressed information that was untimely disclosed by the defendant in discovery. <u>Porter</u>, 2003 WL 21946595, at *5-*6. In <u>Scott</u>, a supplemental report detailing an expert's additional testing was allowed upon the court's determination that the potential harm to the defendant was slight and that any additional discovery that was required would not impact the trial date. <u>Scott</u>, 2007 WL 3171937, at *2.

opinions expressed by Dr. Durig in his report and as explained in his depositions and <u>Daubert</u> hearing testimony.

### b. Qualifications

The Defendant challenges Dr. Durig's qualifications to testify as an expert in this case, arguing that Dr. Durig has no specialized skill, knowledge or experience related to windows or window hinges.  [Doc. 48].

Upon careful review of Dr. Durig's qualifications, including his training, education, and prior experience, the Court concludes that Dr. Durig is qualified to proffer expert opinions regarding whether the design of the Norco Series D casement window at issue in this case was defective. While Dr. Durig admittedly has never given a product-defect opinion specifically with respect to a window or window hinge, Dr. Durig's mechanical engineering background and his experience with accident investigations and failure analysis render him adequately qualified to provide opinions in this case.  Dr. Durig's lack of specific experience in proffering opinions regarding design defects in windows or window hinges is an issue more properly directed to the weight to be given Dr. Durig's testimony rather than its admissibility.  For these reasons, the Court will not exclude Dr. Durig's opinions due to a lack of qualifications on his part.

### c.    Reliability of Opinions

The Defendant next argues that Dr. Durig's opinions should be excluded as unreliable because they are not based upon sufficient facts or data and were not the product of reliable principles and methods, and because Dr. Durig failed to apply properly his principles and methods to the facts as testified to by the Plaintiffs.  [Doc. 48].

Rule 702 of the Federal Rules of Evidence requires that an expert opinion be "based upon sufficient facts or data" and that the expert apply the relevant principles and methods "reliably to the facts of the case."  Fed. R. Evid. 702.  "It follows that an opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert." Fernandez v. Spar Tek Indus., Inc., No. 0:06-3253-CMC, 2008 WL 2185395, at *6 (D.S.C. May 23, 2008).

In the present case, Dr. Durig repeatedly has stated that in order for this accident to have occurred, the top hinge must have been disconnected from the frame.  Dr. Durig has been unable to state with any certainty, however, how the hinge became disconnected.  Instead, he offers two alternative theories: either the hinge spontaneously detached, or Mr.

Snoznik disconnected the hinge post himself, having been confused by the words "PRY UNDER HERE" imprinted on the hinge.

Dr. Durig testified that he observed spontaneous detachment of the exemplar hinge during his second round of testing. He admitted, however, that this spontaneous detachment occurred only after an unknown number of manipulations and disconnections, which had created wear on the exemplar hinge and had made detachment of the exemplar hinge arm easier. There is no evidence in the record, however, to suggest that the Snozniks' window had ever been subjected to similar, repeated manipulation and disconnection or that its hinge components demonstrated the kind of wear that Dr. Durig had observed on the hinge components of the exemplar window. Indeed, it is undisputed that prior to the day of the accident, the Snozniks had never manipulated the window hinges into the "L" position. Nor is there any evidence that the top hinge arm had ever been removed from the hinge post.

The lack of similarity between the condition of the Snozniks' window and the exemplar window used by Dr. Durig in his testing raises serious doubts as to the reliability of his spontaneous detachment theory. As the Eighth Circuit has explained:

> Experimental evidence falls on a spectrum and the foundational standard for its admissibility is determined by whether the evidence is closer to simulating the accident or to demonstrating abstract scientific principles. The more the experiment appears to simulate the accident, the more similar the conditions of the experiment must be to the actual accident conditions.

Fireman's Fund Ins. Co. v. Canon U.S.A., Inc., 394 F.3d 1054, 1060 (8th Cir. 2005) (citations and quotation marks omitted). Here, the Snozniks proffer Dr. Durig's testimony not to demonstrate some abstract scientific principle, but rather to show how this accident actually occurred. As such, it becomes incumbent on the Snozniks to show that the condition of the exemplar window used by Dr. Durig was substantially similar to the condition of their window at the time of the accident in order for his opinions on this issue to be relevant. Given Dr. Durig's admission that the exemplar window was subjected to repeated manipulation and disconnection which caused wear on the hinge components, his failure to quantify this wear in any meaningful way, and the lack of evidence that the Snozniks' window was ever treated to such similar treatment or wear, the Court must conclude that the Snozniks have failed to show that the exemplar window was in a condition similar to that of their window at the time of the accident. As such, Dr. Durig's testing, and his resulting opinions concerning the

possibility of the hinge's spontaneous detachment, cannot be considered reliable.

Dr. Durig's alternative theory – that Mr. Snoznik must have been confused by the words "PRY UNDER HERE" and thus disconnected the hinge himself – is also problematic.  Mrs. Snoznik testified that she never saw her husband disconnect the hinge, nor did she ever observe the hinge disconnected from the hinge post.  For his part, Mr. Snoznik has limited recall of the events on the day of the accident and cannot remember whether he disconnected the hinge or not.  Thus, there is no affirmative evidence in the record to suggest that Mr. Snoznik was responsible for the hinge becoming disconnected.

Even assuming that Mr. Snoznik did in fact disconnect the hinge, however, there is absolutely no evidence to suggest that Mr. Snoznik did so because he was confused by the words imprinted on the hinge or that he even saw those words.  It is just as possible that Mr. Snoznik did not read the words imprinted on the hinge, or that he read them and was not confused by them, but nevertheless proceeded to intentionally disconnect the hinge in order to make the sash easier to move into the Easy Wash

position.[4]  These latter scenarios could have happened in the absence of

any defective design or warning on the part of the Defendant.  There simply

is not a sufficient factual record to determine whether any of these

scenarios were more likely than not to have occurred.  In the absence of an

adequate factual foundation, to suggest that Mr. Snoznik disconnected the

hinge because he was confused by the instructions is simply speculation

on Dr. Durig's part.  Accordingly, Dr. Durig's opinions in this regard are

unreliable and must be excluded.

In addition to the inadequacy of the factual foundation for some of Dr.

Durig's opinions, the Court further finds that Dr. Durig did not employ a

reliable scientific methodology.  "A reliable expert opinion must be based

on scientific, technical or other specialized *knowledge* and not on belief and

speculation, and inferences must be derived using scientific or other valid

---

[4]Contrary to the Plaintiffs' assertion that this accident could have occurred only
as a result of accidental disconnection or spontaneous detachment, the Court can
imagine any number of ways that this accident could have happened.  For example,
Mrs. Snoznik could have dislodged the sash from the window by leaning too heavily on
the sash during the cleaning process.  Or Mrs. Snoznik's vigorous cleaning of the sash
could have caused Mr. Snoznik to lose his balance and lean out of the frame
excessively, causing the hinge to detach.  Of course, this is purely speculation on the
Court's part, as there is no evidence in the record to suggest that either of these
scenarios actually occurred.  The fundamental problem with the Plaintiffs' theory of
liability, however, is that there is no evidence in the record from which a reasonable jury
could conclude that *any* of the possible factual scenarios – including those proposed by
the Plaintiffs themselves – more likely than not occurred.  Rather, there is only
conjecture and speculation by the Plaintiffs' expert as to what *might* have happened.
Dr. Durig's speculative theories, however, are simply not admissible in this case.

methods." Oglesby v. Gen. Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999).  "To qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation – i.e., 'good grounds,' based on what is known." Morehouse v. Louisville Ladder Group LLC, No. Civ. A. #3:30-887-22, 2004 WL 2431796, at *4 (D.S.C. June 28, 2004).  Proper scientific methodology involves the generation of hypotheses and the performance of empirical testing to determine if such hypotheses can be falsified. Daubert, 509 U.S. at 593, 113 S.Ct. 2786.

In the present case, the Court has difficulty discerning what exactly Dr. Durig did to reach his conclusions, as he does not appear to have adhered to any methodical program or protocol in the course of his testing. Dr. Durig testified that his method of testing the exemplar window consisted primarily of, in his words, having "played with" the window and manipulating the hinges over the period of several months.  [See Durig Dep. I, Doc. 49-6 at 30].  Such haphazard tinkering hardly can be considered a rigorous scientific methodology.  Furthermore, aside from a few photographs, taken sporadically over the months that the testing was performed, Dr. Durig made no written or video recordings to document his testing of the

exemplar window. To the extent that he took measurements of the force required to disconnect the hinge from the hinge post, he took such measurements only occasionally and in any event did not record them. And, as previously discussed, Dr. Durig failed to account for or otherwise quantify the wear that his testing caused on the hinge components, despite the fact that he readily admitted that repeated removal of the hinge arm made detachment easier. Thus, to the extent that Dr. Durig's methodology in testing the exemplar window can even be identified, the Court fails to see how it could possibly be replicated or verified in a scientific manner.

Dr. Durig was criticized for using a similarly defective methodology in the Morehouse case, supra. In that case, the plaintiff was injured when he fell from a ladder, and he claimed that his fall was caused by a defect in the ladder's design. In support of this theory, the plaintiff relied upon the opinions of Dr. Durig, who concluded that the accident had occurred because the ladder lacked the overall strength necessary to support foreseeable loading conditions during usage. Morehouse, 2004 WL 2431796, at *2. Dr. Durig reached this conclusion after noting that taking numerous trip up and down an exemplar ladder caused the front side rails of the ladder to show evidence of permanent deformation. Id. The district

court excluded Dr. Durig's opinions, concluding that his methodology was

unreliable due to the lack of documentation of his testing:

> The court agrees with Plaintiff that to the extent that Dr. Durig's opinion is based on the very specific facts of this case, it does not lend itself to peer review. The court refuses to accept, however, any contention by Plaintiff that Durig's hypothesis testing – i.e., climbing the exemplar ladder – need not have been videotaped or otherwise recorded so that the results might be scrutinized by Defendant as well as others in the scientific community. For example, Dr. Durig stated in his report that "[a]fter numerous ascending and descending trips on the exemplar ladder, both front side rails show evidence of permanent deformation." Durig Report at 3. In making this sweeping assertion, however, Dr. Durig failed to include several critical details of his hypothesis testing, such as the number of ascending and descending trips he took on the exemplar ladder before this "deformation" took place, or his body weight on the day of testing the exemplar ladder in comparison to Plaintiff's weight on the day of the accident. Because Durig failed to record his hypothesis testing or include relevant details in his report, it is extremely difficult for the court to evaluate the reliability of his work. Accordingly, the court finds that Dr. Durig's report also fails to possess the indicia of reliability necessary under the [Daubert factors].

Morehouse, 2004 WL 2431796, at *7.

Similarly, in the present case, Dr. Durig's failure to document his

testing adequately makes it extremely difficult for the Court to determine

whether his work is reliable. Without adequate documentation, whether in

writing, through photographs or by video, Dr. Durig's testing simply cannot be replicated by others in the scientific community. For example, because of the lack of proper documentation, it is not known how many times the top hinge was actually manipulated before it began to detach from the hinge post simply by being moved into the "L" position. It is also not known how much force was applied in each manipulation, because Dr. Durig's measurements either do not exist or they were randomly recorded. It is also not known the extent to which Dr. Durig's repeated manipulations and detachment of the hinge affected the ease with which the hinge could be detached from the hinge post. In light of these deficiencies, the Court concludes that the methodology employed by Dr. Durig fails to possess the indicia of reliability required under <u>Daubert</u>, and thus Dr. Durig's opinions regarding the existence of a design defect in the Norco Series D casement window must be excluded.[5]

### C. Ruston Hunt

The Defendant also seeks to exclude the testimony of the Plaintiffs' human factors/warnings expert, Dr. Ruston Hunt. For grounds, the

---

[5]Having reached the conclusion that Dr. Durig's opinions regarding the existence of a design defect in the Defendant's window are inadmissible, the Court need not determine the admissibility of Dr. Durig's other opinions, including the existence of feasible alternative hinge designs.

Defendant argues that Dr. Hunt is not qualified to give opinions regarding design defects in windows or window hinges, and that his opinions are not reliable. [Doc. 48].

## 1. Dr. Hunt's Qualifications

Dr. Hunt holds a Bachelor of Science in Industrial Engineering, a Master of Science in Industrial Engineering, and a Ph.D. in Mechanical Engineering, each from the University of Illinois. He is presently the Dean of the Extended University at Southern Polytechnic State University in Marietta, Georgia, and is responsible for the development, coordination and administration of externally funded research grants, sponsored programs and continuing education for the university. From 1988 to 1995, he served as the President and Senior Scientist of Search Technology in Norcross, Georgia, where he was responsible for corporate planning and management, as well as technical activities including program management, and consulting and expert witness testimony in human factors. From 1996 to 2002, he served as President and CEO of Search Technology, where his activities included human factors consulting and expert witness testimony on human factors issues. From 2002 to the present, Dr. Hunt has served as President of RM Hunt Ltd. in Norcross,

Georgia, providing human factors-based analysis and design of consumer and industrial products, instructions, and hazard warning materials. As President of RM Hunt Ltd., his activities include development of warning information as well as post-accident analysis of warnings in support of litigation. [Doc. 49-10 at 4].

### 2. Dr. Hunt's Opinions

### a. Dr. Hunt's Report

In his report dated July 1, 2009, Dr. Hunt opines that the Norco Series D Window as designed is unreasonably dangerous for the following reasons:

1. The printed instructions for using the Easy-Wash feature are unclear and ambiguous and likely to lead to dangerous consequences.

2. The instructions imprinted on the hinge arms and control arms are unclear and ambiguous and likely to lead to dangers [sic] consequences.

3. There are no warnings or cautionary materials supplied with the Norco Series D Window with Easy-Wash Casement Hinge regarding the hazards associated with intentionally or accidentally prying off the hinge arm off of the black posts that secure the sash at the top and bottom of the frame.

4. Because of the potential for damage to the product and injury to homeowners, the mechanism to release the sash should require more deliberate action such as the use of a special purpose tool.

5. There is no safety stop to keep the sash from coming out of the hinge unintentionally.

6. Packaging of the Norco Series D Window with Easy-Wash Casement Hinge was not designed in such a way as to reasonably insure that instruction for the safe use of the window would reach end users such as Mr. and Mrs. Snoznik.

[Hunt Report, Doc. 49-10 at 13].

### b. Dr. Hunt's Deposition Testimony

In his deposition taken on July 15, 2009, Dr. Hunt testified that in his opinion, the design of the Norco window creates a hazard to a person cleaning the window because the Easy Wash feature "causes a person to necessarily get up in and open the window and reach out towards the exposed edge of the window." [Deposition of Ruston Hunt ("Hunt Dep."), Doc. 49-11 at 136]. Dr. Hunt opined that this hazard requires some type of warning, but he admitted that he had not drafted appropriate alternative warnings:

Q      And what should the warning say?

A      There should be information in the instructions about how to do this safely.

Q      And what would that say?

A      I haven't crafted those instructions.  I think this is an inherently unsafe design, and so my recommendation would be to repair the design rather than try to prevent injury through warnings.
                    *      *      *
Q      And is it your opinion that – that that is a hazard that cannot be effectively eliminated and the product should not be designed that way?

A      Well, I didn't say that.  I think there may be – I believe there are other approaches to getting this window cleaned.  That ultimately is the purpose here, that if properly designed could reduce the likelihood of someone falling out of the window.  And that that might involve both the design and the instructions and warnings.

Q      But you have no – you have not thought of any instructions or warnings that you would use for this; correct?

A      I've not created those warnings.

Q      And you have not created an alternative design to prevent this risk of the person cleaning the window falling out?

A      No.

[Id. at 136-38].

Although Dr. Hunt agreed with Dr. Durig that the hinge bar must have been disconnected from the hinge post in order for the accident to occur, he does not offer an opinion as to how the hinge bar actually became disconnected. [Id. at 165]. He further conceded that he is not an expert in either the manufacture or design of windows or window hinges. [Id. at 79-80].

Dr. Hunt admitted that he has no knowledge of any evidence suggesting that Mr. Snoznik was confused by the words "PRY UNDER HERE" on the hinge bar. [Id. at 165]. He further admitted that there is no evidence that the Snozniks ever saw the printed instructions for the Norco window. [Id. at 181]. Nevertheless, he opined that the printed instructions were a causal factor of this accident because they were inadequate and ambiguous. [Id. at 183].

With respect to his opinions regarding the need for a safety stop, Dr. Hunt admitted that he did not have any specific design in mind, rather only that "in general there needed to be some sort of safety stop." [Id. at 195]. Dr. Hunt admitted that he had not seen any casement window that incorporated any sort of safety stop. [Id. at 196].

Regarding his opinion that the packaging of the Norco Series D Window was not designed in such a way as to reasonably insure that instruction for the safe use of the window would reach end users, Dr. Hunt admitted that he had no reason to believe that the instructions were not included in the packaging of the window. [Id. at 197].

### c. Supplemental Affidavits of Arthur Snoznik and Dr. Hunt

On November 3, 2009, in response to the Defendant's motion to exclude Dr. Hunt's opinions, the Plaintiffs submitted the affidavits of Arthur Snoznik and Dr. Hunt. In his affidavit, Mr. Snoznik concedes that his memory of the accident is impaired due to the head injuries he sustained. [Affidavit of Arthur Snoznik ("Snoznik Aff."), Doc. 56-16 at ¶5]. Nevertheless, Mr. Snoznik goes on to state in Paragraph 6 of his affidavit as follows:

> I understand that in order for the sash to fall from the frame, either the top hinge detached on its own, or someone must have detached the top hinge of the window; i.e., someone must have followed the instruction printed on the hinge to "PRY UNDER HERE." Because the window will not close and lock if the hinge is detached, the hinge must have been detached after Betsy or I unlocked and opened the window. Betsy testified that she did not detach the top hinge. We were the only two people working with the windows on April 15, 2006, and so *I conclude that*

> *one of two things must have occurred: (1) I followed the stamped instruction to "PRY UNDER HERE," and I pried up the tab, believing that doing so was part of the operation of the EZ Wash hinge; or (2) the hinge post came off on its own, without my touching the hinge hardware at all. There are no possible explanations for the sash's falling from the window frame that day.* I know that I did not fall out of the window and pull the sash out of the frame with me as I fell. Rather, I know that, as I was steadying the window while Betsy cleaned it, the sash fell, pulling me out of the window before I could react.

[Id. at ¶6] (emphasis added). In Paragraph 7 of his affidavit, Mr. Snoznik further states that had the words "PRY TO REMOVE SASH" appeared on the hinge hardware installed on the window, this warning would have prevented him from detaching the top hinge and would have prevented the fall and his injuries altogether. He further states that it was not his intention to remove the sash from the window. [Id. at ¶7].

In his affidavit, Dr. Hunt seeks to clarify his opinion, as previously stated in his report, that the instruction "PRY TO REMOVE SASH" imprinted on the window's hinge track is unclear and ambiguous. [Affidavit of Dr. Ruston Hunt ("Hunt Aff."), Doc. 56-14 at ¶1]. Dr. Hunt now states that the inclusion of the phrase "PRY TO REMOVE SASH" among the phrases identified in his report as defective was inadvertent. [Id. at ¶3]. Dr. Hunt states that it is in fact his opinion that "PRY TO REMOVE SASH"

42

is a superior instruction and should have been used in lieu of "PRY UNDER HERE" on the hinge arm.  [Id. at ¶4].

After reviewing Mr. Snoznik's affidavit, Dr. Hunt further opines that the words "PRY TO REMOVE SASH" would have informed Mr. Snoznik of the results of any contemplated prying, and that the use of such instruction on the hinge arm would have changed Mr. Snoznik's behavior on the day of the accident.  [Id. at ¶5].

### 3.    Analysis

Before addressing the admissibility of Dr. Hunt's opinions, the Court first must address the Defendant's Motion to Strike the Affidavits of Arthur Snoznik and Dr. Hunt.  Because Dr. Hunt's affidavit is based in part on a supplemental affidavit submitted by Arthur Snoznik, the Court will address Mr. Snoznik's affidavit first.

### a.    Motion to Strike Snoznik Affidavit

The Defendant moves to strike Paragraphs 6 and 7 of Mr. Snoznik's affidavit.  For grounds, the Defendant argues that Mr. Snoznik's testimony is not based on his personal knowledge and further contradicts his prior sworn deposition testimony.  [Doc. 67].  The Plaintiffs argue that Mr. Snoznik's affidavit is sufficiently based on his personal knowledge and is

consistent with the Plaintiffs' theory of causation and the other evidence forecasted in this case.  [Doc. 73].

Rule 602 of the Federal Rules of Evidence provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602.  To have personal knowledge of a matter, a witness must have awareness of the events about which the witness intends to testify.  27 Charles Alan Wright and Victor James Gold, Federal Practice and Procedure § 6023 (2d ed. 2007).  This awareness includes not only the ability to perceive or observe events at the time that they occurred, but also the ability to presently recall that past perception.  Id.  Of course, the law does not require that a witness have perfect recall in order to testify about an event.  As long as it is reasonable to believe that a witness is testifying based on his present memory of his original perceptions, questions regarding the adequacy of the witness' memory are generally issues that go to the credibility and weight to be given the testimony, rather than its admissibility.  See Gell v. Town of Aulander, 252 F.R.D. 297, 305 (E.D.N.C. 2008).  "If, however, the witness' memory is so impaired that [he] cannot testify coherently without filling the gaps in [his] memory with hearsay or

speculation, the witness lacks personal knowledge."  Wright and Gold,

supra.

In the present case, Mr. Snoznik concedes that his memory of the

accident is impaired due to the head injuries he sustained in the fall.

Despite his confessed lack of recall for the events leading up to the

accident, Mr. Snoznik states in Paragraph 6 of his affidavit that one of two

events must have occurred: (1) either he followed the stamped instruction

to "PRY UNDER HERE," and he pried up the tab, believing that doing so

was part of the operation of the Easy Wash hinge; or (2) the hinge arm

spontaneously detached from the hinge post.  This statement, however, is

not based on his perception of what occurred at the time of the accident:

Mr. Snoznik concedes that he has no present recollection of these events.

Rather, his testimony is merely speculation of what *might have* occurred

prior to the sash falling from the window frame.  Given his lack of memory

of these particular events, Mr. Snoznik lacks personal knowledge to testify

as to what may or may not have occurred prior to his fall.

Mr. Snoznik's testimony regarding what he would have done in the

presence of alternative instructions is similarly problematic.  Mr. Snoznik

states in Paragraph 7 that had the words "PRY TO REMOVE SASH"

appeared on the hinge hardware installed on the window, this warning would have prevented him from detaching the top hinge and would have prevented the fall and his injuries altogether. This testimony presupposes that Mr. Snoznik read the instruction imprinted on the hinge arm at all. Mr. Snoznik, however, has no recollection of ever having read the instruction, much less having been misled by it. Because Mr. Snoznik lacks the personal knowledge required to testify as to whether he read the instruction imprinted on the hinge arm, Mr. Snoznik's testimony that a different instruction would have altered his behavior is sheer speculation and is inadmissible.

The other assertion that Mr. Snoznik makes in Paragraph 7 – that he did not intend to remove the sash from the window frame – does appear to be based on his personal knowledge and will not be stricken.

For these reasons, the Court will grant the Defendant's motion to strike the entirety of Paragraph 6 and portions of Paragraph 7 of Mr. Snoznik's affidavit.

### b.    Motion to Strike Hunt Affidavit

The Defendant moves to exclude Dr. Hunt's affidavit as an untimely expert disclosure. [Doc. 66]. The Plaintiffs counter that Dr. Hunt's affidavit

is a proper supplementation of his expert report, as it was intended to correct an inadvertent error in his opinions.  [Doc. 71].

As the Court noted in discussing Dr. Durig's supplemental affidavit, the rules regarding supplementation allow a party to correct inadvertent mistakes or omissions in an expert report.  Such rules, however, are "not a license to amend an expert report to avoid summary judgment."  Gallagher, 568 F.Supp.2d at 631.  After carefully reviewing Dr. Hunt's report, as well as the excerpts of his deposition testimony presented by the parties, the Court concludes that Dr. Hunt's supplemental testimony goes beyond merely correcting an inadvertent error.  In his affidavit, Dr. Hunt states that the instruction "PRY TO REMOVE SASH" constitutes a superior instruction that should have been used on the window at issue.  Dr. Hunt previously stated in his report, however, as follows:

> **The use of the words** to "pry the hinge" (written instructions), "PRY UNDER HERE", (stamped on hinge arm), **"PRY TO REMOVE SASH"** (on the track) and "DEPRESS ARM TO DETACH" (stamped on the control arm) **are unclear and ambiguous.**  The likelihood of confusion should be obvious to one who knows how this product is supposed to work.  But, for the Snozniks, before the accident, it is not likely that they were aware that these words applied to completely different purposes.

[Hunt Report, Doc. 49-10 at 12] (emphasis added).  Furthermore, Dr. Hunt

was repeatedly asked in his deposition whether he had drafted alternative

warnings or instructions, and he testified that he had not done so.  [Hunt

Dep., Doc. 49-11 at 136-38].   Dr. Hunt's new opinions completely

contradict both his prior report and his deposition testimony, and there is

nothing in this record to indicate that Dr. Hunt's previous opinion of the

ambiguous nature of the instruction "PRY TO REMOVE SASH" or his

omission of an alternative instruction was a mere error.[6]

Upon considering the Akeva factors, the Court concludes that, like

Dr. Durig's affidavit, Dr. Hunt's affidavit must be stricken as untimely.  The

Plaintiffs have offered no justification for disclosing this new opinion after

the close of discovery and the filing of dispositive motions.  Allowing Dr.

Hunt's affidavit at this late date would require the Court to reopen discovery

and would require the parties to undergo the expense of additional rounds

of depositions and supplemental reports and briefing, which would be

---

[6]The Plaintiff contended at the Daubert hearing that Dr. Hunt did not intend to
proffer an opinion regarding the ambiguous nature of the instructions when read
*individually* but rather only meant to state an opinion regarding the ambiguous nature of
these instructions when read *collectively*.  This is not a reasonable interpretation of Dr.
Hunt's report and testimony.  In any event, such an opinion would be irrelevant, as it is
undisputed that the Snozniks never saw the written instructions related to this window.
Thus, whether the instructions were confusing when considered collectively is of no
consequence in this case.

completely disruptive to the trial schedule.  For these reasons, the Court will grant the Defendant's motion to strike Dr. Hunt's supplemental affidavit. The Court therefore will consider only those opinions expressed by Dr. Hunt in his report and as explained in his subsequent deposition and Daubert hearing testimony in considering the Defendant's Daubert motion and motion for summary judgment.

### c.  Qualifications

While not disputing Dr. Hunt's qualifications as a human factors expert, the Defendant argues that Dr. Hunt is not qualified to give the fourth and fifth opinions set out in his report, namely that the mechanism to release the sash should require more deliberate action such as the use of a special purpose tool and that the window is defective because there is no safety stop to keep the sash from coming out of the hinge unintentionally. [Doc. 47].  The Court agrees that the Plaintiffs have failed to establish that Dr. Hunt is adequately qualified to proffer such opinions.  Indeed, Dr. Hunt conceded in his deposition that he does not consider himself to be an expert on the design, manufacture or installation of windows and window hinges.  [Hunt Dep., Doc. 49-11 at 79-80].  Accordingly, the Court will exclude the fourth and fifth opinions set out in Dr. Hunt's report.

### d.    Reliability of Opinions

The Defendant contends that the remainder of Dr. Hunt's opinions should be excluded as unreliable because they are not based upon sufficient facts or data and were not the product of reliable principles and methods, and because Dr. Hunt failed to apply properly his principles and methods to the facts.  The Defendant's primary argument in favor of excluding Dr. Hunt's opinions, however, is that Dr. Hunt's opinions are unreliable because he failed to devise alternative warnings/instructions to test them.  [Doc. 47].

Human factors analysis, otherwise known as ergonomics, is essentially the study of "the interrelationship between human behavior or capabilities and the surrounding environment."  Douglas R. Richmond, Human Factors in Personal Injury Litigation, 46 Ark. L. Rev. 333, 335 (1993).  As a general rule, human factors experts study or evaluate factors such as: "the (a) effects that fatigue, drug, alcohol, or other physical principles have on humans; (b) human necessities that manifest reactions to stimuli; (c) events that result from product warnings; (d) purposes for which hazardous warnings are needed; (e) potential reactions caused by machinery control functions; and (f) expected behavioral responses caused

by the existence or lack of devices." Id. at 337. To be admissible, a human factors expert's testimony must provide more than just common sense observations to the jury. If the testimony fails to provide "scientific, technical or other specialized knowledge" or merely concerns matters that are clearly within the jury's knowledge, then such testimony should be excluded. See Fed. R. Evid. 702.

In the present case, the Court fails to see how Dr. Hunt's opinions are any more than commonsense observations that are within the realm of the common experience and knowledge of jurors. As such, his opinions would not be helpful to a jury and should therefore be excluded. Moreover, Dr. Hunt fails to explain how his opinions are derived from any "scientific, technical or other specialized knowledge." While he opines that both the written and printed instructions related to the window are unclear and ambiguous, he offers no scientific or technical support for this opinion. He did not test any of the subject instructions, explaining in his Daubert hearing testimony that testing of the window and its instructions was not possible as it could have resulted in serious injury to the test subjects. The Court is highly dubious of Dr. Hunt's claim that there is no plausible way to test the efficacy of such instructions, as it appears they could have been

tested just as easily through other means than actual use of the window, such as comprehension testing or surveys of potential users. Absent any sort of testing or other scientific analysis, Dr. Hunt's opinion regarding the ambiguity of the instruction must be excluded as unreliable. As the Supreme Court has held, "nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit evidence that is connected to existing data only by the *ipse dixit* of the expert." <u>Kumho Tire</u>, 526 U.S. at 157, 119 S.Ct. 1167.

Dr. Hunt also opines in his report that in his opinion, the Snozniks acted reasonably based on their understanding of the product. [Hunt Report, Doc. 49-10 at 9]. The Court fails to see how this is a proper issue for expert testimony, as it is well within a jury's province to determine whether a person's actions were reasonable under the circumstances.

The most critical deficiency in Dr. Hunt's report, however, is his failure to draft and test any alternative warnings or instructions. Courts have held that a human factors expert's failure to draft and test proposed alternative warnings or instructions renders the expert's opinions on the adequacy of the product's warnings or instructions unreliable. <u>See</u> <u>Bourelle v. Crown Equip. Corp.</u>, 220 F.3d 532, 539 (7th Cir. 2000)

(excluding expert's testimony regarding adequacy of existing warnings where expert failed to draft an alternative warning); <u>Jaurequi v. Carter Mfg. Co.</u>, 173 F.3d 1076, 1084 (8th Cir. 1999) (excluding expert testimony on adequacy of warnings where experts had not "created or even designed a warning device which would have been more appropriate, much less tested its effectiveness"); <u>Shreve</u>, 166 F.Supp.2d at 403 (excluding expert testimony regarding alternative warnings where "plaintiffs offer[ed] no empirical data or testing to support [the expert's] conclusions as to the desirability and adequacy of the warnings and instructions provided by defendants"); <u>Fernandez</u>, 2008 WL 2185395, at *10 (excluding expert's testimony on inadequacy of machine's warnings where expert failed to "provide reference to any generally accepted standard which would support the requirement for any specific warning which he contended was absent").

In the present case, Dr. Hunt has not proffered any opinions based on scientific, technical or other specialized knowledge. Rather, his opinions concern matters that are clearly within the scope of the common knowledge of a jury. Additionally, he has not provided alternative instructions that he contends should have been used on the subject window, nor has he performed any testing that would support the use of an

alternative instruction.[7]  "The fact that [plaintiffs' expert] never even drafted a proposed warning renders his opinion akin to 'talking off the cuff' and not acceptable methodology."  <u>Bourelle</u>, 220 F.3d at 539.  For these reasons, the Court concludes that Dr. Hunt's opinions regarding the adequacy of the warnings/instructions provided are unreliable and must be excluded.

## C.    Defendant's Experts

Having determined that the Plaintiffs' experts should be excluded as unreliable under Rule 702 and <u>Daubert</u>, the Court need not address the admissibility of the opinions of Howard Rigsby, Dr. Charles Manning, and Dr. Michael Romansky, as these witnesses were designated as experts by the Defendant for the sole purpose of rebutting the Plaintiffs' expert testimony.  Accordingly, the Plaintiffs' motion to exclude the Defendant's expert witnesses will be denied as moot.

---

[7]Dr. Hunt did attempt to propose "PRY TO REMOVE SASH" as a superior alternative instruction in his supplemental affidavit, but that testimony has been stricken for the reasons stated <u>supra</u>.  Even if such testimony were not stricken, Dr. Hunt's opinions would still be unreliable due to his failure to perform any sort of testing of this proposed "alternative" instruction.

## IV.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Defendant moves for summary judgment as to all of the Plaintiffs' claims, arguing that the Plaintiffs have failed to present a forecast of evidence to show that the Norco window at issue had a product defect and that the defect proximately caused the Plaintiffs' injuries.  [Doc. 51].

### A.    Standard of Review

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "As the Supreme Court has observed, 'this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"  Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (emphasis in original).

A genuine issue of fact exists if a reasonable jury considering the evidence could return a verdict for the nonmoving party.  Shaw v. Stroud,

13 F.3d 791, 798 (4th Cir. 1994). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the non-moving party who must convince the Court that a triable issue does exist. Id.

> A party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. Furthermore, neither unsupported speculation, nor evidence that is merely colorable or not significantly probative, will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that reasonable minds could differ on a material point, then, regardless of any proof or evidentiary requirements imposed by the substantive law, summary judgment, if appropriate, shall be entered.

Id. (internal citations and quotation marks omitted). Nonetheless, in considering the facts for the purposes of a summary judgment motion, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**B. Analysis**

    **1. Negligence**

        **a. Design Defect**

The Plaintiff Arthur Snoznik seeks to hold the Defendant liable in negligence for the defective design of the Norco Series D casement window. [Complaint, Doc. 1-2 at ¶¶19-24].

Under North Carolina products liability law, a manufacturer has a duty to use reasonable care to ensure that a product is designed and manufactured without any potentially dangerous defects. <u>Red Hill Hosiery Mill, Inc. v. MagneTek, Inc.</u>, 138 N.C. App. 70, 75, 530 S.E.2d 321, 326, <u>rev. denied</u>, 353 N.C. 268, 546 S.E.2d 112 (2000). To sustain a products liability claim based on a theory of negligence, a plaintiff must prove that "(1) the product was defective at the time it left the control of the defendant, (2) the defect was the result of defendant's negligence, and (3) the defect proximately caused the plaintiff's damage." <u>Id.</u>

In proving these elements, a plaintiff is allowed to use certain inferences. For example, direct evidence of an actual defect in the product may give rise to an inference of negligence on the part of the manufacturer. <u>Id.</u> Direct evidence of a defect may be established through expert

testimony.  See id.  Absent direct evidence of an actual defect, "a product defect may be inferred from evidence of the product's malfunction, if there is evidence the product had been put to its ordinary use."  Id. at 76-77, 530 S.E.2d at 327.  The North Carolina Supreme Court has cautioned that "[i]t is not, however, permissible to infer manufacturer negligence from a product defect which has been inferred from a product malfunction."  Id. at 77 n.7, 530 S.E.2d at 327 n.7.  "In other words, a plaintiff may not prove negligence by stacking inference upon inference.  Negligence may not be inferred without actual evidence of a defect."  Carlton v. Goodyear Tire & Rubber Co., 413 F.Supp.2d 583, 588 (M.D.N.C. 2005).

In the present case, the Plaintiffs have attempted to present a forecast of direct evidence of a design defect[8] through the testimony of their expert witnesses, Dr. Bryan Durig and Dr. Ruston Hunt.  The Court has excluded Dr. Durig and Dr. Hunt's opinions, however, as unreliable under Daubert.  Without the testimony of these expert witnesses, the Plaintiffs have no direct evidence of a product defect which would give rise to an inference of negligence on the part of the Defendant.  Moreover, the

---

[8]Although their Complaint makes general allegations of both a design and a manufacturing defect [see Doc. 1-2 at ¶20(b)], the Plaintiffs now assert that they are pursuing only a theory of a design defect [see Doc. 69 at 12 n.8].

Plaintiffs have not presented a forecast of evidence of any negligent act or omission that occurred during the Defendant's design process of this particular product. Absent such evidence, no reasonable jury could find that the alleged defect was the result of the Defendant's negligence. See Carlton, 413 F.Supp.2d at 588. For these reasons, the Court concludes that the Defendant is entitled to a judgment as a matter of law with respect to the Plaintiff's negligence claim based on a theory of a design defect.

### b. Failure to Warn/Inadequate Warnings

Arthur Snoznik also asserts a negligence claim against the Defendant based on a theory of failure to warn and/or to provide adequate instructions. Specifically, the Plaintiff alleges that the Defendant was negligent in failing to warn of the consequences of detaching the upper hinge while cleaning the window [Complaint, Doc. 1-2 at ¶20(e)] and in failing to warn consumers of the danger of following the direction to "PRY UNDER HERE" imprinted on the hinge arm [Id. at ¶20(g)].

A manufacturer has a duty to "properly inform users of a product's hazards, uses, and misuses or be liable for injuries resulting therefrom under some circumstances." Edwards v. ATRO SpA, 891 F.Supp. 1074, 1077 (E.D.N.C. 1995) (quoting Smith v. Selco Products, Inc., 96 N.C. App.

151, 156, 385 S.E.2d 173 (1989)).  This duty to warn continues post-sale to the extent that the manufacturer subsequently learns of any defects in the product.  Id.

To prevail on an inadequate warning/instruction theory, a plaintiff must prove: (1) the manufacturer acted unreasonably in failing to provide a warning or instruction; (2) such failure was a proximate cause of the plaintiff's harm; and (3) either (a) the failure to warn or instruct created an unreasonably dangerous condition that the manufacturer knew or should have known posed a substantial risk of harm to a foreseeable plaintiff or (b) after the product left the manufacturer's control, the manufacturer became aware or should have become aware that the product posed a substantial risk of harm to foreseeable plaintiffs, and the manufacturer failed to take reasonable steps to provide adequate warnings or instructions regarding such risk or to take other reasonable actions under the circumstances. N.C. Gen. Stat. § 99B-5(a).

Assuming, for the purposes of this motion, that the Defendant breached the duty to adequately warn or instruct the Plaintiff of the dangers of disconnecting the hinge arm from the hinge post, the Plaintiff still must prove that the Defendant's breach proximately caused his injuries.  Based

on the forecast of evidence presented, the Court must conclude that the Plaintiff has failed to present a forecast of evidence to establish this proximate cause.

While Mr. Snoznik theorizes that it is possible that he was the one responsible for disconnecting the hinge (thus enabling the sash to fall from the window frame), he has no affirmative evidence from which a jury could conclude that this more likely than not occurred. Mrs. Snoznik testified that she did not observe Mr. Snoznik disconnect the hinge. While she left the room for several minutes – which arguably would have given Mr. Snoznik the opportunity to disconnect the hinge – Mrs. Snoznik did not testify that she saw the hinge disconnected upon her return. For his part, Mr. Snoznik has testified repeatedly that he does not remember whether or not he disconnected the hinge. The Plaintiffs have maintained that it is entirely possible that Mr. Snoznik did not disconnect the hinge at all, but rather the hinge disconnected on its own.

Assuming for the sake of argument that Mr. Snoznik did disconnect the hinge, there is no evidence to establish why he did so. Mr. Snoznik contends that he must have read the instruction "PRY UNDER HERE" on the hinge arm and mistakenly believed that this was part of the Easy Wash

process. He argues that this is the only possible reason he would have disconnected the hinge, because it was not his intention to remove the sash from the window frame. This theory, however, is pure speculation and is not based on any actual evidence. Mr. Snoznik does not recall what he did prior to the accident and thus cannot affirmatively state that he actually read this instruction, much less that he was misled by it. It is just as likely that Mr. Snoznik read the instruction and realized that it was not part of the Easy Wash process, but proceeded to detach the hinge anyway, not because he intended to remove the sash but rather because he thought that temporarily disconnecting the hinge would have made the sash easier to move within the window frame for cleaning.

The Plaintiff's theory of liability relies upon a series of inferences upon inferences: because the sash fell out of the frame, the hinge must have been disconnected, and if the hinge was disconnected, it either occurred spontaneously due to a design defect or it occurred because Mr. Snoznik followed the faulty instruction imprinted on the hinge arm and disconnected it himself. But the Plaintiff has presented no forecast of evidence, other than the mere fact that the accident occurred, to support his theory that he disconnected the hinge. Nor has he presented a forecast

of evidence to show that he did so *because of* the Defendant's faulty warning/instruction. Although Mr. Snoznik states that a different instruction on the hinge arm, such as "PRY TO REMOVE SASH" would have changed his behavior, this statement is utter conjecture in light of the complete lack of evidence that the hinge was in fact disconnected by Mr. Snoznik in the first place. Under these circumstances, the inference that an adequate warning would have resulted in a change of Mr. Snoznik's behavior is simply speculation. "[T]he court cannot permit a question to go to the jury upon mere speculation of proximate cause." <u>Edwards</u>, 891 F.Supp. at 1078.

For these reasons, the Court concludes that the Defendant is entitled to a judgment as a matter of law with respect to the Plaintiff's negligence claim based on a theory of a failure to adequately warn or instruct.

### 2. Breach of Implied Warranty of Merchantability

In his second cause of action, Arthur Snoznik alleges that the Defendant breached the implied warranty of merchantability. [Complaint, Doc. 1-2 at ¶¶25-31].

The Uniform Commercial Code, as adopted by the state of North Carolina, provides in pertinent part as follows:

(1) Unless excluded or modified (G.S. 25-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . . .

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used;

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

N.C. Gen. Stat. § 25-2-314 (Supp. 2009). To prevail on a claim for a breach of the implied warranty of merchantability under N.C. Gen. Stat. § 25-2-314, a plaintiff must establish: (1) that the goods were subject to an implied warranty of merchantability; (2) the goods were not "merchantable" at the time of sale; (3) the plaintiff was injured by the defective condition;

and (4) the plaintiff suffered damages.  DeWitt v. Eveready Battery Co.,

355 N.C. 672, 683, 565 S.E.2d 140, 147 (2002).

In the present case, Mr. Snoznik claims that there are two possible

causes of the accident: either the sash spontaneously detached from the

window frame or he must have read the instruction to "PRY UNDER HERE"

and disconnected the hinge, mistakenly believing that this instruction

related to the Easy Wash process.  The Plaintiff has no direct evidence to

support these theories, instead relying on circumstantial evidence to create

an inference of a defect.  A plaintiff asserting a claim for breach of the

implied warranty of merchantability is not required to present direct

evidence of a specific defect in order to prevail on his claim.  Id. at 689, 565

S.E.2d at 151.  Rather, "the burden sufficient to raise a genuine issue of

material fact in such a case may be met if the plaintiff produces adequate

circumstantial evidence of a defect."  Id.  To assist the Court in determining

whether a plaintiff has presented sufficient circumstantial evidence to allow

for an inference of a defect in a particular case, the North Carolina

Supreme Court has identified a non-exclusive list of factors to consider,

including: (1) the malfunction of the product; (2) expert testimony regarding

possible causes of the malfunction; (3) evidence regarding the amount of

time that had passed between the plaintiff acquiring the product and the malfunction; (4) evidence of similar accidents involving the same product; (5) evidence that eliminates other possible causes of the accident; and (6) evidence that tends to establish that the accident would not have occurred in the absence of the defect. Id. at 689-90, 565 S.E.2d at 151. A plaintiff does not have to satisfy all of these factors in order to make out a circumstantial case. Evans v. Evans, 153 N.C. App. 54, 61, 569 S.E.2d 303, 308 (2002), disc. rev. denied, 356 N.C. 670, 577 S.E.2d 296 (2003). These factors should be considered together, with no one factor being dispositive. Carlton, 413 F.Supp.2d at 590. Not all of these factors are equal, however, and some factors may be afforded greater weight depending upon the particular circumstances of the case. Id.

The first factor to be considered under DeWitt is whether the window malfunctioned. The Middle District of North Carolina has explained that the use of the term "malfunction" in this context "merely refer[s] to an event that *could* result from a product defect." Carlton, 413 F.Supp.2d at 590. Here, the Plaintiff has presented a forecast of evidence to show that the sash fell from the window frame, an event which certainly *could* be the result of some sort of product defect. Of course, the sash may have fallen out of the

frame for reasons other than a defect in the product, such as an intentional disconnection of the hinge. Thus, while evidence of the sash falling from the window frame by itself would not constitute sufficient evidence to infer a product defect, it is evidence from which a reasonable jury could conclude that a malfunction of the window occurred. See id.

As for the second factor, the Plaintiff did attempt to present expert testimony to establish the possible causes of the accident, but this testimony has been excluded as unreliable. As such, there is no evidence before the Court which establishes a specific product defect that caused the sash to fall from the window frame.

The third DeWitt factor requires the Court to consider the amount of time that had passed between the Plaintiff acquiring the product and the occurrence of the accident. The forecast of evidence presented indicates that the Plaintiffs had the subject window installed in their home in 2001, and the accident occurred approximately five years later. Although the Plaintiffs had opened and closed the subject window at various times and never had a problem with the window malfunctioning, it is also undisputed that the Plaintiffs had never attempted to manipulate the hinges into the Easy Wash position prior to the accident. Thus, while several years had

passed since the Snozniks had the window installed, there is nothing to suggest that they had ever attempted to manipulate the window in this particular fashion during this time. This factor, then, must be considered neutral.

As for the fourth factor, the Plaintiff has not presented a forecast of evidence to show that any similar accidents have ever occurred with this type of window. This factor, therefore, does not weigh in the Plaintiff's favor.

The final two DeWitt factors require the Court to consider evidence that eliminates other causes of the accident and evidence that the accident could not have occurred in the absence of a defect. For the reasons already extensively discussed in this opinion, the Plaintiff has not produced a forecast of evidence that eliminates the possibility that this accident occurred for reasons other than a defective product or that the accident could not have occurred absent a defect. The Plaintiff contends that the circumstantial evidence in this case points to only two possible causes of this accident, both of which, he maintains, indicate a defect in the Defendant's product. The Plaintiff ignores, however, the fact that the

circumstantial evidence also could support a finding that this accident occurred for reasons other than a defect.

After careful consideration of all six <u>DeWitt</u> factors, the Court concludes that the Plaintiff has failed to present circumstantial evidence capable of supporting the inference that the accident more likely than resulted from a defect in the Defendant's product. "Plaintiff's case is really based on nothing more than conjecture and speculation. This is not enough to survive summary judgment." <u>Carlton</u>, 413 F.Supp.2d at 593. For these reasons, the Defendant's motion for summary judgment will be granted as to the Plaintiff's claim for a breach of the implied warranty of merchantability.

### 3.    Breach of Express Warranty

In his third cause of action, Arthur Snoznik alleges that the Defendant provided an express warranty to him to the effect that the Norco Series D casement window was free of defects. [Complaint, Doc. 1-2 at ¶¶32-38]. The Plaintiff, however, has failed to present a forecast of evidence that the Defendant communicated any relevant express warranty to him.[9]

---

[9]In fact, the Plaintiffs do not even address this cause of action in their response brief.

Accordingly, the Court concludes that the Defendant is entitled to a judgment as a matter of law as to the Plaintiff's express warranty claim.

### 4. Loss of Consortium

The fourth cause of action asserted in the Plaintiffs' Complaint is a claim for loss of consortium by Arthur Snoznik's wife, Betsy Snoznik. [Complaint, Doc. 1-2 at ¶¶39-42].

Because Mrs. Snoznik's claim for loss of consortium is dependent upon the survival of the underlying claims asserted by Mr. Snoznik against the Defendant, the dismissal of Mr. Snoznik's products liability claims necessitates the dismissal of Mrs. Snoznik's loss of consortium claim as well. See Nicholson v. Hugh Chatham Mem'l Hosp., Inc., 300 N.C. 295, 304, 266 S.E.2d 818, 823 (1980); Jones v. Southcorr, L.L.C., 324 F.Supp.2d 765, 783 (M.D.N.C.), aff'd, 117 F. App'x 291 (4th Cir. 2004).


## V. CONCLUSION

The Plaintiffs have presented no evidence of what caused Mr. Snoznik's fall and thus what caused his injuries. During the critical moments at issue, Mrs. Snoznik was out of the room and thus has no knowledge to offer. Unfortunately, Mr. Snoznik's injuries are such that he

has no real recollection of these events either. The Plaintiffs attempt to bridge this gap on a theory that the mere fact that the accident occurred speaks for itself, and therefore, Mr. Snoznik's injuries must have resulted from the Defendant's negligence. To establish liability on the part of the Defendant requires more, however, than merely proving that the accident occurred. It also requires more than mere conjecture of what *might* have caused the accident. Because the Plaintiffs have presented no competent evidence of a defect in the window that proximately caused their injuries, their claims cannot survive summary judgment.

Accordingly, **IT IS, THEREFORE ORDERED** that:

(1) Defendant's Motion to Exclude Expert Testimony of Bryan Durig [Doc. 45] is **GRANTED**;

(2) Defendant's Motion to Exclude Expert Testimony of Ruston Hunt [Doc. 46] is **GRANTED**;

(3) Plaintiffs' Motion to Exclude Expert Testimony [Doc. 50] is **DENIED AS MOOT**;

(4) Defendant's Motion to Strike Affidavits of Dr. Durig and Dr. Hunt [Doc. 66] is **GRANTED**;

(5)    Defendant's Motion to Strike Arthur Snoznik's Affidavit

[Doc. 67] is **GRANTED IN PART** and **DENIED IN PART**;

and

(6)    Defendant's Motion for Summary Judgment [Doc. 51] is

**GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**.  A

Judgment consistent with this Memorandum and Decision shall be entered

simultaneously herewith.

**IT IS SO ORDERED**.

Signed: May 12, 2010

Martin Reidinger
United States District Judge